# FILED UNDER SEAL

## PURSUANT TO 31 U.S.C. § 3730

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, *ex. rel.*<br>[UNDER SEAL]<br><br>Plaintiffs,<br>v.<br><br>[UNDER SEAL],<br><br>Defendants.** | **CIVIL ACTION NO:<br><br>*QUI TAM* COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex. rel*. PATRICK FIELD,<br><br>Plaintiffs,<br>v.<br><br>FRANKLIN TOWNE CHARTER HIGH SCHOOL, THE BOARD OF TRUSTEES OF FRANKLIN TOWNE CHARTER HIGH SCHOOL, FRANKLIN TOWNE CHARTER ELEMENTARY SCHOOL, THE BOARD OF TRUSTEES OF FRANKLIN TOWNE CHARTER ELEMENTARY SCHOOL, JOSEPH VENDITTI, MANDREL CONSTRUCTION COMPANY, INC., and OMNIVEST MANAGEMENT, LLC,<br><br>Defendants. | CIVIL ACTION NO:<br><br>QUI TAM COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

## I. INTRODUCTION

1. Plaintiff-Relator Patrick Field ("Plaintiff-Relator"), brings this action on behalf of the United States of America against Defendants, Franklin Towne Charter High School ("FTCHS"), the Board of Trustees of Franklin Towne Charter High School, Franklin Towne Charter Elementary School ("FTCES"), the Board of Trustees of Franklin Towne Charter Elementary School, Joseph Venditti ("Venditti"), Mandrel Construction Company, Inc. ("Mandrel") and OmniVest Management, LLC ("OmniVest") for treble damages and civil penalties arising from Defendants' false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*.

2. The violations arise out of practices occurring at FTCHS and FTCES, including: (1) false certifications to the Pennsylvania Department of Education ("PA DOE") required for receipt of federal grants certifying that FTCHS and FTCES's use of funds complied with all federal, state, and local laws despite both schools using federal funds in connection with no-bid construction contracts and subsequently receiving kickbacks from Mandrel and OmniVest; and (2) false certifications to the PA DOE attesting that Defendant FTCHS's use of federal grants complied with all federal, state, and local laws despite the high school's discriminatory student admissions practices that unfairly excluded students based on their race and disability.

3. As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Plaintiff-Relator has provided to the Attorney General of the United States and to the United States Attorney for the Eastern District of Pennsylvania a statement of all material evidence and information related to the complaint. The aforementioned disclosure statement is supported by material evidence known to Plaintiff-Relator and this filing establishes the existence of Defendants' false claims. Because the statement includes attorney-client communications and work product of Plaintiff-

Relator's attorneys and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Plaintiff-Relator understands this disclosure to be confidential.

## II. JURISDICTION AND VENUE

4. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. The Court has jurisdiction over this case pursuant to 31 U.S.C §§ 3732(a) and 3730(b). The Court also has jurisdiction pursuant to 28 U.S.C. 1345 and 28 U.S.C. § 1331.

5. Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in the District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transact and transacted business in the District.

## III. PARTIES

6. The Government Plaintiff in this action is the United States of America ("United States" or "U.S."). Pursuant to the provisions of 31 U.S.C. § 3730(b)(1) *et seq*., Plaintiff-Relator is suing in the name and on behalf of the United States.

7. Plaintiff-Relator, Patrick Field, is a citizen of the United States and resides at 12727 Cabell Road, Philadelphia, PA, 19154. Plaintiff-Relator has served as the Chief Academic Officer ("CAO") for FTCHS since 2013 and continues to serve as CAO as of the time of the Complaint's filing. From 2006 through 2009, Plaintiff-Relator served as the Principal of FTCHS. From 2009 through 2010, Plaintiff-Relator served as the Chief Executive Officer ("CEO") and Principal of FTCES and continued to serve as Principal of FTCES until 2013. At FTCES, Plaintiff-Relator oversaw all aspects of the operations of the school.

8. Plaintiff-Relator is an original source of this information to the United States. He has direct and independent knowledge of the information on which the allegations are based and he voluntarily provided such information to the United States Government before filing an action under the False Claims Act based on the information.

9. Defendant FTCHS is a non-profit corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 5301 Tacony Street Box 310, Philadelphia, PA, 19137.

10. The Board of Trustees of Franklin Towne Charter High School, actually known as the Board of Directors of Franklin Towne Charter High School ("BOD"), is a non-profit organization, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 5301 Tacony Street Box 310, Philadelphia, PA, 19137. The BOD of FTCHS includes Vice Chair Francesco DiCianni, Joseph Coughlin, William Maher, and John Carty. Nancy Hartey and Jerry Volpe are formed members of the BOD, who each resigned in March 2023. The President of the BOD was Joe Garbarino ("Garbarino") until February 2023.

11. Defendant FTCES is a non-profit corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 4259 Richmond St. Philadelphia, PA 19137.

12. The Board of Trustees of Franklin Towne Charter Elementary School is a non-profit organization, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 4259 Richmond St. Philadelphia, PA 19137. The Board of Trustees of FTCES includes Board President Joe Garbarino, Vice Chair

Michele Krajewski, Secretary Thomas Conway, Treasurer Christopher Creelman, Michael Grasso, Thomas McDade III, and Eugene McAleer.

13. Defendant Venditti is an adult individual, and the former CEO of FTCHS as well as a trustee of FTCHS from 2002 until February 2023. In addition, Venditti was the former CEO of FTCES from 2013 to August of 2022. Prior to his role as CEO, Venditti served as President of the BOD at FTCHS.

14. Defendant Mandrel is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 114 N Main St., Doylestown, PA, 18901. At all relevant times, Mandrel was engaged in providing commercial construction services for profit in the Commonwealth of Pennsylvania. Mandrel began providing construction services to FTCHS in 2008 and FTCES in 2009. B. Robin Eglin ("Eglin") and Lawrence J. Grabovski ("Grabovski") are the founders of Mandrel and the principal points of contact on behalf of Mandrel with FTCHS and FTCES.

15. Defendant OmniVest is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 923 Bentley Court, Chalfont, PA 18914. At all relevant times, OmniVest has been a contracted service provider to both FTCHS and FTCES. OmniVest provides back-office and financial support to both FTCHS and to FTCES. Eglin is the CEO and President of OmniVest and the principal point of contact on behalf of OmniVest for FTCHS and FTCES. OmniVest operates in concert with Mandrel; indeed, Eglin directs both entities and the entities share a business website.[1]

---

[1] OmniVest's website is available at: https://omnivestllc.com/. Mandrel's website is a page on OmniVest's website, available at: https://omnivestllc.com/mandrel/index.html.

## IV. BACKGROUND

16. FTCHS (PA DOE Administrative Unit Number 126513450) was founded in 1999 and concurrently awarded a charter from the School District of Philadelphia. FTCHS has since operated as a charter school sanctioned by the School District of Philadelphia and serves nearly 1,300 students from grades nine through 12 that reside in Philadelphia, Pennsylvania. The administrators of FTCHS include CEO Brianna O'Donnell, Principal John Dougherty, Chief Operations Officer Felix Simmons, Plaintiff-Relator, Director of Pupil Services and School Psychologist Shamon James, PhD, Director of Special Education JoAnn Attewell, and Director of Technology Allen Hall; the Administrative Office Secretary is Sue McGeehan. Plaintiff-Relator knows and works with these administrators daily.

17. FTCHS maintains ownership of the building, facilities, and premises located at 5301 Tacony Street Box 310, Philadelphia, PA, 19137. These facilities include the following: Building 108 and Building 109, together the main school facility; Building 12, the activity center; and Building 215, which houses art classes and the school gymnasium.

18. Plaintiff-Relator has served as a senior administrator of FTCHS for the entire relevant period, including as the Principal from 2006 through 2009 and CAO since 2013.

19. In 2009, Plaintiff-Relator was instrumental in founding FTCES, the feeder elementary school and K-8 school equivalent for FTCHS, where he served as CEO from 2009 to 2010 and Principal from 2009 to 2013. While working at FTCES, Plaintiff-Relator oversaw all aspects of the operations of the school, and despite since moving on to work at the high school, has knowledge of the construction bidding process at FTCES through serving in his current role at FTCHS because both schools contract with Mandrel and OmniVest as detailed below.

20. FTCES (PA DOE Administrative Unit Number 147513703) was granted a charter from the School District of Philadelphia in 2009, which has been periodically renewed since then. FTCES has historically shared former and future administrators with FTCHS. The current administrators at FTCES include CEO James "Jimmy" Rodgers ("Rodgers"), Special Education Coordinator Theresa Goodchild, Assistant Principal for Grades 4-8 William Gretzula, Principal Matthew Kocher, Assistant Principal Kevin McKeever, Assistant Principal for Grades K-3, Jamie Neal, and Chief Financial Officer Megan Walsh.

21. In addition to supervising the FTCHS's day-to-day operations, Plaintiff-Relator's duties include overseeing the high school's academic program, including by implementing a school-wide curriculum, interviewing, hiring, and recruiting staff members, and supervising all professional development.

22. Plaintiff-Relator has also notably written grant applications for millions of dollars in federal funding aimed at helping FTCHS provide academic enrichment to its students.

23. Plaintiff-Relator has over 16 years of combined experience working at FTCHS and FTCES.

24. During the course of his employment, Plaintiff-Relator learned that Mandrel provided kickbacks to Venditti in exchange for granting Mandrel millions of dollars' worth of no-bid construction projects at FTCHS and FTCES. FTCHS and FTCES specifically used various federally-funded grants and other federal revenue streams without soliciting competitive bids for renovation projects at the schools, contrary to certifications made by the schools and in violation of regulations associated with the receipt of funding by the schools.

25. In addition, Plaintiff-Relator learned that Defendants manipulated the results of the purportedly random FTCHS 2023 student admissions lottery (the "Lottery") to discriminate

against applicants on the basis of their race and disability. Defendants specifically eliminated applicants from the pool on the basis of race and disability and then conducted a sham lottery process in which these students had zero chance of admission.

26. As the administrator tasked with certifying and receiving federal grants from the Government, Venditti is aware of the false claims submitted to the Government given that he managed FTCHS and FTCES's no-bid construction contracts and received kickbacks from Mandrel in the form of free vacations and free construction services for his personal residence. Additionally, Venditti oversees the FTCHS Lottery, and he personally manipulated the file the school uses to randomly select applicants for admission to FTCHS by removing names based on disability and race.

## V. PERTINENT REGULATORY BACKGROUND

### 1. The False Claims Act, 31 U.S.C. § 3729, *et seq.*

27. The False Claims Act ("FCA") provides, in pertinent part, that any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the 2461 note; Public Law 104-4101, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

28. For purposes of the FCA, the terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2)

acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B). The FCA defines the term "claim" in pertinent part, as:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

*Id.* at § 3729(b)(2).

29. For purposes of the FCA, the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at § 3729(b)(4). Additionally, "[a] defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001–02, 198 L. Ed. 2d 348 (2015).

**2. <u>Charter School Funding</u>**

30. Charter schools are public schools that are independently operated. These schools receive funding from their students' resident school districts and offer free tuition for all students in accordance with P.S. 24 § 17-1725-A.

31. A charter school's funding is calculated using a statutory formula that provides tuition for nonspecial as well as special education students.

32. Once per year prior to October 1, charter schools must submit final funding requests to each students' resident school district based on the average daily membership for the students enrolled in the charter school from that same school district for the prior school year.

33. As Local Education Agencies ("LEAs"), charter schools are eligible to apply for and receive federal grants that are distributed to them through the PA DOE.

34. Pennsylvania public local agencies, including charter schools, are required to file Annual Financial Report ("AFR") with the PA DOE, detailing their sources and amounts of federal, state, and local funding.

35. One example of significant PA DOE funding that charter schools were eligible to receive includes the over $7 billion in funding to Pennsylvania schools to aid schools in responding to the COVID-19 pandemic.

36. Beginning in May of 2020, following the onset of the COVID-19 pandemic, Elementary and Secondary School Emergency Relief ("ESSER") grants were provided to LEAs so that schools across the nation could safely and effectively modify their operating procedures. ESSER funds were distributed over three installments, including via the Coronavirus Aid, Relief, and Economic Security (CARES) Act signed into law on March 27, 2020, providing ESSER I (CFDA Number 84.425D), the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act signed into law on December 27, 2020, providing ESSER II (CFDA Number 84.425D), and the American Rescue Plan (ARP) Act signed into law on March 11, 2021, which provided ARP-ESSER also known as ESSER III (CFDA Number 84.425U and Federal Award ID Number S425U210028).

## VI. FACTS OF THE CASE

37. Since their inceptions, FTCHS and FTCES applied for and/or received millions of dollars in federal grant monies, intended to assist in the provision of a quality education for students.

38. FTCHS and FTCES have received federal money every year since they were founded.

39. Federal funding to FTCHS and FTCES from 2013 to 2022 is listed below:

| FTCHS and FTCES's Federal Revenue | | |
|---|---|---|
| **School Year** | **FTCHS** | **FTCES** |
| 2021-22 | $ 5,395,639 | $ 4,383,525 |
| 2020-21 | $ 4,268,186 | $ 1,710,362 |
| 2019-20 | $ 2,031,476 | $ 1,576,943 |
| 2018-19 | $ 1,806,473 | $ 1,369,481 |
| 2017-18 | $ 1,687,156 | $ 1,280,464 |
| 2016-17 | $ 1,517,722 | $ 1,085,321 |
| 2015-16 | $ 1,339,127 | $ 973,860 |
| 2014-15 | $ 1,362,264 | $ 969,964 |
| 2013-14 | $ 2,028,355 | $ 966,122 |
| **Total** | **$ 21,436,398** | **$ 14,316,042** |

(Source: Annual Financial Audit Reports filed with the School District of Philadelphia)

40. FTCHS and FTCES applied for and/or received three ESSER grants for use over the course of the 2020 through 2024 school years.

41. According to the PA DOE's website, the United States Department of Labor ("U.S. DOE") reimbursed FTCHS $859,056.00 for an ESSER I grant, $1,144,509 for an ESSER

II grant, and at least $1,088,005.45 for an ESSER III grant as of November 2022, for use at FTCHS during the 2020 through 2024 school years. ESSER funds granted to FTCHS totaled, at a minimum, over $3 million, to say nothing of other federal funding.

42. According to the PA DOE's website, the U.S. DOE reimbursed FTCES $672,550.00, for an ESSER I, $886,665 for an ESSER II grant, and at least $842,891.35 for an ESSER III grant as of November 2022, for a total of, at a minimum, over $2.4 million dollars.

43. In connection with the ESSER funds, the U.S. DOE has requisite certifications and detailed reporting requirements that schools submit to receive the funds. As described below, the certifications submitted by and on behalf of FTCHS and FTCES contained false statements in order to obtain funding despite non-compliance with program requirements and applicable law and regulations.

44. To receive ESSER funds, FTCHS and FTCES submitted detailed reports ("ESSER Reports") that identified the interventions and activities supported by the funds.

45. The ESSER grant reporting form also contains a detailed budget summary, wherein FTCHS and FTCES listed exactly how the allocated money would be used to support the goals of these funds.

46. Agents on behalf of a school must certify the reports produced to the PA DOE regarding the use of funds are in accordance with federal, state, and local law, among other conditions. The ARP-ESSER III Agreement, for instance, states and requires certification of the following:

> The development and execution of the program outlined in this Agreement and subsequent reimbursement for such program by the Department will be in accordance with this Agreement's provisions as finally approved by the Department and shall comply with all applicable provisions of federal, state, and local laws, the official regulations pertaining thereto, program guidelines and instructions issued by the Pennsylvania Department of Education.

47. Venditti certified the foregoing statement on behalf of FTCHS and FTCES.

48. Throughout his long tenure as CEO, Venditti has made dozens if not hundreds of similar certifications in connection with the receipt or reporting on FTCHS's and FTCES's use of federal grants.

49. Indeed, the Certification and Agreement for Funding under the Education Stabilization Fund Program Elementary and Secondary School Emergency Relief Fund (ESSER Fund) required to be signed by the Chief State School Officer on behalf of the PA DOE as a condition of participation in the program contains an acknowledgement that failure to comply with applicable federal law and regulation may result in liability under the False Claims Act. As a result, the PA DOE relies on the certifications and assurances of school officials in making its own certification as a condition of federal funding. These requirements, and others described herein, rendered the certifications made by and on behalf of FTCHS and FTCES material to the federal government's agreement to issue funding.

50. The false certifications submitted by and on behalf of FTCHS and FTCES resulted in false claims for payment through federal funding programs.

**1. <u>No-bid Construction at FTCHS and FTCES</u>**

51. Despite certifying compliance with federal, state, and local law, FTCHS and FTCES used ESSER funds and other federal funds to fund no-bid construction projects in connection with the receipt of kickbacks from the hired construction company, Mandrel, rendering the use of federal grant money false claims in violation of the FCA.

52. Plaintiff-Relator possesses knowledge about FTCHS's and FTCES's procedures and practices for soliciting bids from construction contractors. Plaintiff-Relator is thus uniquely qualified to make this assertion.

53. Plaintiff-Relator states that on or about September 8, 2021, at least $533,617.00 of the FTCHS's ESSER II funding was used for a no-bid third-floor expansion of the building completed by Mandrel.

54. Mandrel's work on the third floor at FTCHS was the result of a no-bid contract, meaning that other construction companies did not have the opportunity to submit public bids to compete for the project. Instead, Mandrel was given unilateral authority to determine the cost for the services requested.

55. Bidding is standard in the construction business in order to obtain low-cost services from the most qualified applicants for the services required. Soliciting competitive bids from more than one contractor permits the bid solicitor to evaluate which contractor can perform the necessary services at the best rate, thus ensuring the bid solicitor pays a competitive market rate for services and gets the best contract terms, as providers have to compete for one open job. Additionally, open bidding creates transparency in the process, discouraging improper influence by one individual or entity.

56. Furthermore, charter schools are subject to stringent bidding requirements for construction projects.

57. As public entities, charter schools are bound by Pennsylvania's Separations Act, 71 P.S. § 1618. This law requires public entities to obtain at least the following four separate, competitive bids for all construction projects when the cost of construction exceeds $4,000: general contracting, plumbing, electrical, and ventilation work.

58. Despite these specific requirements, FTCHS did not solicit a single bid, let alone a bid for general contracting, plumbing, electrical, and ventilation work (the "Four Prime Bids") for the third-floor renovation project, or any construction projects after 2014, when FTCHS

formally hired Mandrel as its "Construction Manager," which continues through the present, in a failed attempt to avoid the law.

59. On or about August 15, 2014, Grabowski, who was President of Mandrel at the time and is now the Vice President as well as a Project Manager for OmniVest Properties Management, LLC, explained in a letter to Venditti how the FTCHS could hire Mandrel as a "Construction Manager," a practice, that Grabowski insisted, has occurred in multiple Philadelphia charter schools.

60. This 2014 alteration to FTCHS's contract with Mandrel, in which Mandrel assumed the title of "Construction Manager," did not absolve FTCHS from its duty to pay a fair price for its requisite construction services by soliciting bids. Indeed, simply altering Mandrel's title is a translucent veil Mandrel donned in order to avoid the time-consuming process of proper bidding.

61. Since assuming the position of Contract Manager, Mandrel has received and completed several no-bid construction jobs at costs of millions of dollars in addition to the third-floor expansion project. These projects, which span 2014 to the present include, but are not limited to, the following:

a. In 2017, Mandrel began work on the demolition and construction of a two-story gymnasium and expansion of classroom space. Following demolition, Mandrel added a 15,000 square foot gymnasium to the facility which included seating for 1,100 people and a running track and weight, aerobic, and shower facilities.

b. Throughout 2017 and continuing until 2019, Mandrel demolished and retrofitted a three-story classroom space, expanding the FTCHS facility's classroom space by 45,000 square feet and adding modern science and computer labs to the facility. Mandrel also

retrofitted a 38,000 square feet section of the building to a vanilla shell exterior. These major renovation projects cost FTCHS several million dollars.

62. By hiring Mandrel as a contract manager in an attempt to avoid reporting requirements by having Mandrel manage the bids associated with a construction project, FTCHS not only failed to obtain competitive bids as required by law, but it also misdirected precious school resources that could have gone to advancing student learning.

63. In and of itself, retaining a single construction company to fulfill multiple no bid requests is a misuse of federal funding that charter schools receive. Moreover, Mandrel and its affiliated management company, OmniVest, paid FTCHS kickbacks in exchange for the ability to perform years of no-bid construction at the FTCHS and FTCES.

64. Since 2001 and continuing to the present, OmniVest has been engaged in providing education management, financial aid, and real estate services within the Commonwealth of Pennsylvania. OmniVest provides back-office services, including bookkeeping management support to FTCHS and FTCES.

65. As a result of his position as CEO, Venditti was in charge of overseeing and controlling all of FTCHS's and FTCES's construction projects with Mandrel as well as FTCHS's and FTCES's work with OmniVest.

66. Eglin is the President and CEO of OmniVest and Mandrel. As a result of their highly profitable and mutually beneficial kickback scheme that lasted for years, Eglin and Venditti have developed a close relationship[2] and inseparable connection between their respective construction company, management businesses, and FTCHS and FTCES.

[2]Evidencing the tight link between Mandrel and FTCHS is the fact that current FTCHS employees, including the Chief Operating Officer Felix Simon ("Simon"), are former employees of Mandrel Construction. In the case of Simon, Venditti helped secure the position by and through his connection to Eglin and Mandrel.

67. FTCHS BOD's practices further exacerbate this conflict-of-interest between Eglin's companies, Mandrel and OmniVest, and the schools, FTCES and FTCHS. Eglin is permitted to attend every BOD meeting to provide a financial report and explain the progress on the construction projects he manages. By having Eglin attending all BOD meetings, the BOD does not have an opportunity to independently assess the cost and process for construction at the school, but instead relies on the person who directly profits from them, and as such, is not incentivized to minimize costs, consistent with the bidding process required by regulations applicable to charter schools in Pennsylvania.

68. In contrast, management agreements must be negotiated at arm's-length so that a school does not use its government funding to impermissibly benefit a private company, such as OmniVest and Mandrel.

69. This was simply not the case at FTCHS and FTCES, as OmniVest and Mandrel had the power to substantially influence both schools to accept their prices because of Eglin's attendance at BOD meetings, the close relationship between Eglin and Venditti, and the kickbacks Eglin provided to Venditti.

70. Pennsylvania law applicable to charter schools prohibits the payment or receipt of kickbacks as a condition of employment or contracting with charter schools.

71. Indeed, trustees of charter schools or any person affiliated in any way with a charter school cannot demand or request, directly or indirectly, any gift, donation or contribution of any kind from any parent, teacher, employee or any other person affiliated with the charter school as a condition for employment. *See* 24 Pa. Stat. § 17-1725-A(e).

72. In addition, "[a] person who serves as an administrator for a charter school shall not receive compensation from another charter school or from a company that provides

management or other services to another charter school." 24 P.S. § 17-1715-A(12) (emphasis added).

73. Violations of these provisions may cause the revocation or non-renewal of a school's charter. *See* P.S. § 17-1729-A(a)(4). The federal funding received by charter schools is conditioned upon a school maintaining its charter in good standing.

74. Despite this, Plaintiff-Relator had many conversations with Joe Venditti over the past fifteen years, as a result of their consistent proximity at the FTCHS facility regarding kickbacks Eglin provided to Venditti in the form of free vacations and personal construction services. In addition, Plaintiff-Relator personally witnessed construction services that Mandrel provided at Venditti's personal properties at no cost to Venditti.

75. Below are illustrative examples of kickbacks Eglin and Grabowski, who reports directly to Eglin, furnished to Venditti for Mandrel's exclusive ability to provide no bid services to FTCHS and FTCES that Venditti ran and from Plaintiff-Relator's conversations with Venditti:

a. In 2007, Joe Venditti purchased a home at 3946 Grant Ave, Philadelphia, PA, 19114. Venditti hired Mandrel to refurbish the kitchen at this new home, and Grabowski was in charge of managing this project. Mandrel, by and through Grabowski, provided demolition services, including a construction dumpster at no cost to Venditti. After completion of the work, Grabowski emailed Venditti an invoice for the dumpster charging him zero dollars. Venditti told Plaintiff-Relator that he was extremely angry at Grabowski for his friend's creation of documentary evidence of his provision of a free construction service. In fact, Venditti called Grabowski while Plaintiff-Relator was in the room at FTCHS to express his frustration at the written evidence of a kickback. As a solution to this

paper trail, Venditti instructed Grabowski to email him a phony invoice charging a real amount for the dumpster, but still provide the dumpster at no cost as Venditti expressed this new invoice was only to create a record, as he had no intention of paying it in accordance with Grabowski's scheme. Venditti's commentary is particularly shocking given that, prior to his career at FTCHS, he served as a criminal defense attorney.

b. In 2015, FTCHS hired Mandrel to install turf in an area surrounding FTCHS. Venditti informed Plaintiff-Relator that he was going to request that Grabowski install the leftover turf on the sun deck of his residence on the shore in Brigantine, New Jersey. In or about 2016, Plaintiff-Relator visited Venditti's residence and saw firsthand the newly-installed turf on his sub deck. Venditti commented, "yeah, Larry did really nice work" confirming that he Venditti was provided not only free services from Mandrel, but also took construction materials paid for by FTCHS through federal funding for his own personal gain.

c. That same year, Mandrel removed an above-ground pool from Venditti's personal residence. Plaintiff-Relator was in the room at FTCHS when Venditti asked Grabowski if he "could send one of his crews up to his house to take [the pool] down and remove it." Plaintiff-Relator witnessed Grabowski make phone calls that permitted him to pull some of his crew members from a job so that they could perform a free pool removal at Venditti's residence.

d. In 2016, Eglin invited Joe Venditti and his wife to attend a trip to Paris. Two days prior to the start of the vacation, Venditti and his wife had to cancel. As a result of this cancellation, Eglin fully reimbursed Venditti for the cost of the trip.

Following the trip that Venditti was unable to attend, Eglin visited FTCHS in his role in providing construction services to FTCHS. Plaintiff-Relator had a conversation in Plaintiff-Relator's office that day in which Eglin confirmed he was willing to do "anything he could" to help Venditti and confirmed he paid a non-refundable lump sum for Venditti's portion of the canceled trip. Just after this trip reimbursement, in 2017 and continuing until 2019, Mandrel began work at FTCHS on the demolition and construction of the building gymnasium, expansion of classroom space, and retrofitting of the building.

e. In 2018, concurrent with Mandrel's work on the gymnasium and classroom renovation project at FTCHS, Eglin took Venditti on a personal vacation to Alaska. When they returned, Venditti told Plaintiff-Relator that, "Robin would not let me pay for anything."

f. In 2022, following Mandrel's completion of the vanilla shell installation on FTCHS's buildings' facade and the third-floor renovation project that earned them over $500,000 dollars in 2021, Eglin and Venditti went on a luxury vacation to Ireland together.

76. At or about the same time as the various no-bid construction projects at FTCHS, Mandrel also performed projects at FTCES, including millions of dollars' worth of construction. Mandrel built an auditorium and parking garage at FTCES that were funded, in part, by FTCES's ESSER grants.

77. As recently as March 27, 2023, Mandrel's crews continue to work on construction projects at FTCHS, including a renovation of the fourth floor of Building 215.

78. These examples of kickbacks in the form of free luxury vacations and personal construction services are part and parcel of the construction projects Mandel provided to the FTCHS and FTCES using the no bid process. The decisions of FTCHS officials to impermissibly forgo soliciting bids for construction projects, and the provision and receipt of kickbacks, occurred at the highest levels FTCHS and Mandrel. The CEOs of FTCHS and Mandrel each possessed clear knowledge of FTCHS's and FTCES's federal funding and the accompanying obligation to obey all local, state, and federal laws in the use of that funding, and moreover, to ensure it was not used for false or fraudulent claims. For years, FTCHS, FTCES, and Mandrel carried out a successful scheme through their mutually beneficial relationship.

79. Throughout the course of his employment at FTCHS, Plaintiff-Relator became aware of Defendants' violations. Plaintiff-Relator diligently reported FTCHS's no-bid policy to the Deputy Inspector General for the School District of Philadelphia, John Saraceno ("Saraceno") beginning in October 2021.

80. On March 15, 2023, after Plaintiff-Relator objected to defendant Venditti's sham student admissions Lottery and after defendant Venditti's resignation, Plaintiff-Relator received a phone call from Garbarino in which Garbarino discussed his proposal at the most recent BOD meeting of a new policy that would explicitly require open bidding for all construction projects and exclude Mandrel as a contractor at FTCHS based on a conflict-of-interest. The BOD unanimously approved the proposal in apparent recognition of the current conflict of interest.

81. Despite the Board adopting this policy, Mandrel continues to perform construction at FTCHS to this day.

**2. <u>FTCHS's Student Admission Lottery</u>**

82. In addition to grossly misusing federal funds in pursuit of a kickback scheme, Defendants also committed further violations of the FCA by discriminating against student applicants in the admission process on the basis of race and disability status.

**A. Pertinent Law**

83. Pennsylvania Charter schools are required to hold a lottery admissions process if they receive more applicants than the available spots. *See* 24 P.S. Education § 17-1723-A. A lottery randomly selects students for enrollment at a charter school but may include some possible acceptable factors to show preference to some student applicants.

84. The Charter Schools Office for the School District of Philadelphia, which authorizes charter schools operating throughout Philadelphia, allows charter schools to show preference to some applicants based on the terms of their charter and enrollment policy. Acceptable factors for such preference include preference for potential students who have siblings currently attending the school, preference for specific feeder schools, or preference for the children of the charter school's founders. These possible preferences must be in accordance with the applicable school's charter and authorized by the School District of Philadelphia.

85. A charter school cannot discriminate during its admissions process or through its admission policies on the basis of a child's disability, need for special education services, or on the basis of intellectual ability. *See* 22 Pa. Code § 711.7(a)-(c).

86. Further, discriminating against students based on race, color, religion, sex, or national origin, as would be a violation of Title VII of the Civil Rights Act of 1964 and the Fourteenth Amendment, violates applicable law. Charter schools cannot discriminate against student applicants based on ethnicity, age, religion, gender identity or expression (known or

perceived), ancestry, national origin, marital status, pregnancy, socio-economic status, English language proficiency, political beliefs, veteran status, disability, athletic ability, intellectual ability, proficiency in the English language, measures of achievement or aptitude, or other protected classes. 24 Pa. Stat. §§ 17-1715-A, 1723-A; 20 U.S.C. § l 413(a)(5); 34 C.F.R.§ 300.209(b); 29 U.S.C. § 794; 34 C.F.R. §§ 104.4(a), (b).

87. The Rehabilitation Act of 1973, and its implementing regulations, holds that qualified handicapped people cannot be excluded from participation in, be denied benefits of, or be discriminated against by any program or activity that receives federal financial assistance, such as FTCHS. *See* 34 C.F.R. § 10 104.4(a).

88. The Pennsylvania Fair Educational Opportunities Act provides that all persons shall have equal opportunities for education regardless of their race, religion, color, ancestry, national origin, sex, handicap, or disability. *See* 24 Pa. Stat. § 5002. Further, the fair educational practices provisions of the Pennsylvania Human Relations Act states that schools cannot ask questions of a student applicant in writing or orally that might even reveal their membership in any protected class(es).

89. In addition to being subject to anti-discrimination law, the Pennsylvania Fair Educational Opportunities Act requires that before September 1 of each year, every school subject to the Pennsylvania Fair Educational Opportunities Act must file with the Human Relations Commission ("Commission") a written statement setting forth in detail the procedures it follows in admitting students, including information disclosing who determines the admission policy, who executes the policy, what specific procedures are followed and what factors are taken into consideration in accepting or rejecting a student. New or amended statements must be filed by a school if and when any changes in the admission procedures from those previously

described in the written statement filed with the Commission are adopted by the school. *See* 16 Pa. Code § 47.21.

**B. Charter School Student Admissions**

90. As required by Pennsylvania Charter school law, FTCHS holds an admission lottery every year for the admission of incoming students. The Lottery occurs in mid-January in the FTCHS auditorium and is digitally recorded.

91. At FTCHS, student applicants must be Philadelphia residents to participate in the Lottery and must have submitted applications prior to the deadline.

92. The Lottery uses a BOD-approved computerized random generation of student names to select student for admission based on a list of students who submitted applications. FTCHS typically selects about 350 to 380 names each year from a list of student applicant names based on a pre-determined number of available seats for the incoming class. The number of available selected Lottery seats is modified by a sibling preference policy as well as a preference for former students at FTCES, the FTCHS's feeder school.

93. FTCHS receives a high number of student applicants in part because of its prestigious local, state, and national rankings and awards based on overall achievements in academics and state-mandated testing among other top rankings among other factors. Beginning in 2006, FTCHS transformed from one of the lowest performing in the city to "one of the highest-achieving schools in the state," propelled by an influx of new administrators and staff using tactics from The National Association of Secondary School Principals' 1998 report "Breaking Ranks: Changing an American Institution." Since then, FTCHS has received numerous prestigious rankings, awards and other accolades, including the San Diego University's National Center for Urban School Transformation in 2010 for outstanding academic

achievement in an urban school, the MetLife Foundation-NASSP Breakthrough School award in 2010, and was even named a National Blue Ribbon School for Academic Excellence by the U.S. DOE in 2014.

**C. FTCHS'S Lottery Policies**

94. Pennsylvania Charter schools are required to host a random lottery admissions process if they receive more applicants than the available spots. *See* 24 P.S. Education § 17-1723-A.

95. The Charter Schools Office for the School District of Philadelphia, which authorizes charter schools operating throughout Philadelphia, allows these schools to show preference to some applicants based on the terms of their charter and enrollment policy. Acceptable factors for such preference include preference for potential students who have siblings currently attending the school, preference for specific feeder school attendees, or preference for the children of the charter school's founders. *See* 24 P.S. Education § 17-1723-A(6).

96. The BOD of FTCHS has, since 2014, included a sibling preference policy in the Lottery. To qualify for sibling preference, a student must have a shared legal guardian or shared legal custody with a currently enrolled FTCHS student or be a biological, half, or step sibling of a currently enrolled FTCHS student. Students receiving preference in the Lottery must submit applications just like any other applicant, but are pre-approved for automatic admission so long as FTCHS determines the student fulfills the requisite sibling qualifications and as long as the amount of sibling applicants does not exceed the total amount of available seats. Sibling preference participants in the Lottery reduced the number of randomly selected seats prior to any random applicants being chosen.

97. FTCHS also provides preference in the Lottery to current FTCES students. Just like sibling preference policy, the FTCES preference policy pre-approves students for automatic admission prior to the selection of random applicants.

98. Beyond the sibling and FTCES preference and the residency and application requirements, applicant selection is purportedly completely random to ensure each child has an equal opportunity to attend the award-winning high school, as is required by applicable law.

99. Other requirements to enroll, such as passing eighth grade and having updated vaccinations, are verified after the Lottery selection and prior to enrollment. Thus, these criteria do not affect a student's ability to enter the Lottery.

100. As CEO of FTCHS, Venditti oversees the Lottery. The Lottery is run by Sue McGeehan ("McGeehan"), FTCHS's administrative office secretary who reports directly to Venditti, and Plaintiff-Relator, as well as Rick Gephart ("Gephart"), a member of the FTCHS's IT staff under Venditti's direction and Venditti's family relative. All of these individuals have participated in administering the Lottery pursuant to the above process, as amended over time, for over the past ten years.

101. Specifically, McGeehan is in charge of updating an Excel spreadsheet of applicants and their personal information including address, zip code, middle school, and a unique identifying number associated with each student for wait-list tracking purposes in the event that a student is not selected in the Lottery. This spreadsheet tracking student names is used for the computerized randomly generated applicant selection in real time on the day of the Lottery.

102. The 2023 Lottery took place on January 20, 2023 at 10:00 A.M. at FTCHS.

103. In the weeks leading up to the Lottery, as well as the months after, Plaintiff-Relator had a series of conversations with other administrators and staff directly involved in the Lottery regarding the student selection process.

104. On January 4, 2023, Plaintiff-Relator had a one-on-one conversation with McGeehan, in which McGeehan discussed Venditti's explicit instruction to manipulate the FTCHS's Lottery. Venditti acted on behalf of the BOD, without its consent and without authority, in violation of FTCHS's internal policies, to withdraw the Lottery's sibling preference policy because he was tired of "bad kids" from "bad families" automatically gaining admission to FTCHS. Venditti informed McGeehan of his plan and instruction to intercept the Lottery with an altered file that he prepared in order to prevent certain students from being selected. To accomplish this, Gephart, who is Venditti's relative, would pre-run the Lottery for FTCHS using Venditti's manipulated file, while maintaining the illusion to the public that the Lottery was entirely random.

105. The following day, on January 5, Plaintiff-Relator personally overheard a conversation between Venditti and McGeehan in which Venditti confirmed his plan that Plaintiff-Relator learned the day prior. Namely, Venditti stated that he knew which kids he wanted from the siblings list and which ones that he did not want. Venditti added that he would "get Rick to work his magic," a further reference to his family member's ability to pre-run the Lottery selection with additional criteria determined by Venditti rather than the randomized selection process that FTCHS certifies.

106. When Plaintiff-Relator checked in with McGeehan on January 19, 2023, the day before the Lottery, Plaintiff-Relator asked if McGeehan was ready for the Lottery. McGeehan stated that Venditti had not sent her "the file" yet—an explicit reference to the manipulated file

Venditti confirmed he would be preparing earlier that month. McGeehan confirmed to Plaintiff-Relator that she received Venditti's altered Lottery file later that day.

107. The day of the Lottery, McGeehan, acting by and through the direction of Venditti, altered the typical Lottery script that Plaintiff-Relator would read to the crowd of parents and applicants in the FTCHS's auditorium to scrub the previous year's script of all references to the FTCES and sibling preference policies in order to not contradict Venditti's unilateral decision to exclude students who qualified for preference from this group.

108. Although Venditti did not personally attend the Lottery, Gephart confirmed to Plaintiff-Relator that Venditti's intent for the Lottery was in full effect as Gephart had Venditti's "secret squirrel file" ready to use during the Lottery. When Plaintiff-Relator inquired to Gephart what he meant by the "secret squirrel file," Gephart mentioned that at the instruction of Venditti, he removed student applicants "from the zip codes [Venditti] does not like." Plaintiff-Relator further pressed what this meant, and Gephart stated that Venditti had given him a list of zip codes to remove. Defendants ran the Lottery using Venditti's secret file to generate a list of selected applicants instead of the random generation process required by law.

109. Plaintiff-Relator obtained the internal and manipulated file Venditti used to generate the student list on February 8, 2023 from a FTCHS secretary as part of her job duties to process a student enrollment form. Both Gephart and Venditti were out of the office at this time.

110. The file contained details about students accepted for the Lottery, students placed on the waitlist, students with siblings at FTCHS, and students from FTCES, as well as lists of students excluded from the Lottery on the basis of race and disability.

111. In relevant part, the Lottery spreadsheet contained the following details and analyses:

a. There were 995 student applicants for the FTCHS 2023 admissions Lottery, including 100 applicants from FTCES, 75 applicants who qualified for sibling preference, and 820 applicants who did not qualify for either of the forgoing privileges.

b. Of the 820 applicants without privileges, 291 were accepted into FTCHS and the rest were placed on an admission waitlist.

**D. FTCHS's Discrimination of Students with Disabilities**

112. Venditti's manipulated Lottery file used during the 2023 student admissions Lottery included a separate "do not take list" of eleven names of students with siblings at FTCHS accompanied by notes next to individual students' names such as "sped discipline," "behavior contract," and "academics and discipline." These terms clearly reference special education status, as well as academic aptitude as rationale for inclusion on this list. This "do not take" list is located below the main list of students with sibling privilege.

113. In prior lotteries, McGeehan and Plaintiff-Relator did not collect and report data on applicants' disability status, as this is not a criteria used to modify the random selection of applicants and such discrimination is unlawful. The decision to add these names to the "do-not-take" list confirms Venditti's intent to tamper with the Lottery knowingly and willfully so that disabled students, despite submitting applications and purportedly receiving an equal opportunity to be selected for admission, could not attend FTCHS. Despite these eleven students having siblings at FTCHS, which is cause for automatic admission to the FTCHS under the school's federally-approved admissions policy, eleven students were excluded from selection for admission to this prestigious school as before they could be chosen, the outcome of the Lottery was fixed to include only students that FTCHS did not perceive to have a disability.

114. The spreadsheet also contains an FTCES tab, which lists a section of students' names and information that are "not in good standing," which contained eleven names. "Students not in good standing" is not a defined term according to BOD policies and not a reason for exclusion from the Lottery according to the FTCHS's internal and federally vetted process. On the excel file, this list is located below the main list of students with FTCES privilege, who purportedly receive automatic admission to FTCHS in accordance with FTCHS's internal and federally vetted admissions policies, similar to the "do not take list" on the siblings preference tab.

115. In pursuit of higher test scores and with the incentive to continue to receive its many student performance-based accolades, Venditti and FTCHS discriminated against students based on disability or perceived likelihood of disability.

116. Indeed, in further confirmation of Venditti and FTCHS's discrimination, Plaintiff-Relator received a phone call the week following the Lottery from a parent, who questioned why her child, a student at FTCES, was not automatically granted admission to FTCHS during the Lottery as per FTCHS's official protocol. Plaintiff-Relator explained that he did not know of a reason why the parent's child was not automatically enrolled. The parent then explained to Plaintiff-Relator that she called on behalf of many disgruntled parents of students with behavioral disabilities and discipline whose children were not permitted to attend FTCHS. When Plaintiff-Relator checked in with McGeehan to confirm if some students from FTCES were not accepted, McGeehan relayed that Venditti provided FTCES a list of students "not in good standing" who were denied enrollment at FTCHS.[3]

---

[3]Plaintiff-Relator learned that, several weeks after the Lottery and only after he brought his concerns regarding discrimination in the Lottery to the Chair of the BOD, FTCHS has enrolled some or all of these rejected students as well as altered the initial Lottery excel file in an effort to cover-up its discriminatory exclusion from the Lottery.

117. McGeehan also confirmed that Venditti received questions from the CEO of FTCES, Rodgers, challenging his denial of a special needs student applicant enrolled at FTCES, who should automatically be granted admission under the admissions policy, and confirmed that according to Venditti's instructions, it is not FTCHS's job to "fix" every student.

**E. FTCHS's Discrimination of Students by Race**

118. Students were not selected randomly by zip code in FTCHS's Lottery, and further analysis reveals that students applicants were strategically and discriminatorily selected or excluded from the Lottery using zip codes, which served as a proxy for race.

119. For example, students from fifteen zip codes were not selected, even when the population of those zip codes would, as a matter of statistics, warrant multiple selections in the purportedly random Lottery.

120. There were 820 students who applied to the Lottery excluding students with sibling preference and who attended FTCES. Students from 39 zip codes across the city applied for admission.

121. 291 Students were selected for admission, representing an overall acceptance rate of 35.49 percent for students without sibling or FTCES admission preference.

122. The average rate of applicant selection across all zip codes should have mirrored this percentage within each zip code (*i.e.*, if a zip code had 17 applicants, about six applicants should have been selected, and if a zip code had 36 applicants, about 13 would be accepted). Any variance in acceptance rate within a zip code should be entirely random in any single year and any individual year's acceptance rate should be statistically insignificant. This was not the case.

123. Indeed, in zip code 19137, the zip code of the FTCHS building, the Lottery process accepted a whopping 97 percent of the 36 applicants (every applicant but one), a far cry from the approximate 13 students that a random lottery would select even accounting for natural variance.

124. Zip code 19137 is one of the zip codes with the greatest proportion of White residents in the city, as 90.8 percent of residents are White.

125. Similarly, FTCHS accepted 80 percent of applicants from zip code 19116 and 100 percent of the 17 applicants from zip code 19154. Located at the northeastern section of the city, these zip codes have only 6 percent and 6.6 percent Black residents, respectively. Additionally, in many instances, FTCHS entirely failed to select students from primarily Black zip codes, including zip code 19146.

126. The zip codes Venditti "does not like" are a proxy for race, as Venditti favors the whiter northern and central eastern sections of Philadelphia and failed to select applicants from many southwestern zip codes, an area that has a much larger Black population. Venditti's geographical proxy for race becomes apparent through analysis of the racial demographics of the city in conjunction with the zip codes of applicants he excluded.

127. FTCHS's racial discrimination in the Lottery is evident in the following two maps of Philadelphia, which were prepared based on the Lottery and demographic data by zip code. In the map of applicants selected by zip code, the red zip codes correspond to the zip codes from which no applicants at all[4] were accepted, while the green zip codes indicate at least one applicant was selected for admission. In the map of race in Philadelphia, green codes for zip

[4]It should be noted that Venditti's failure to exclude every majority Black zip code in Philadelphia in no way undermines the fact that he did exclude and unfairly advantage zip codes based on race. Geographical exclusions are in addition to distinctly racial-geographic discrimination.

codes in which a majority of residents are White and red codes for zip codes in which a majority of residents are Black, and grey zip codes indicate less than a fifteen percent difference in the percentage of residents that are Black and White.[5]

**Map of Applicants Selected for Admission to FTCHS by Zip Code**




**Map of Majority Race of Residents by Zip Code**




128. The foregoing maps indicate a compelling correlation between admission and race.

129. Venditti gerrymandered a line in order to reduce the probability that students from majority Black zip codes are randomly chosen through a legitimate Lottery selection. While White students received admission, Venditti has materially prevented Black students from attending FTCHS.

130. Philadelphia has historically experienced redlining, which refers to a set of discriminatory practices consisting of the systemic denial of services to residents of certain areas

[5]Racial demographic data is sourced from https://www.unitedstateszipcodes.org/.

based on race or other protected status in order to maintain or promote the segregation of certain neighborhoods. Redlining has worked to the great historic detriment of Black residents, who faced increased barriers to apply for mortgages, loans, and other financial services, among other difficulties in obtaining housing and related services. The Fair Housing Act of 1968 outlawed housing discrimination, including redlining, though similar discriminatory practices continued for years afterward and arguably, persist to this day. Venditti's exclusion of Black children from FTCHS is equally cruel, and also likely rooted in a mistaken belief that a student's race is correlated with student outcomes, resulting in Venditti and FTCHS denying equally deserving Black applicants the chance to attend a prestigious high school.

131. Additionally, Philadelphia is one of the most racially segregated cities in the United States, as evidenced by its Dissimilarity index.

132. A Dissimilarity index calculates the extent to which different groups of people live, such as race, in different neighborhoods in a city. A Dissimilarity index of zero indicates perfect integration, in which the racial composition of each neighborhood matches the racial composition of the city. Dissimilarity indices range up to one, which would indicate perfect segregation in which where each neighborhood consists entirely of persons of a single race. The Dissimilarity index "expresses the percentage of the population that would need to move to a different neighborhood in order for each neighborhood's racial/ethnic composition to match that of the larger area."[6] With a White to non-White Dissimilarity index of 59.94 in 2021,[7] Philadelphia County, PA is one of the most segregated cities in the nation, making the city

[6]Joe Cortright, *America's least (and most) segregated cities*, City Observatory (August 17, 2020), available at: https://cityobservatory.org/most_segregated/.
[7]Federal Reserve Bank of St. Louis, Economic Research, *White to Non-White Racial Dissimilarity (5-year estimate) Index for Philadelphia County, PA* (last visited March 28, 2023), available at: https://fred.stlouisfed.org/.

particularly susceptible to redlining and the discriminatory scheme employed by FTCHS and Venditti, as it is easy to draw geographic lines that divide the city of Philadelphia by race.

133. The result of the Lottery confirms that Venditti manipulated the vetted, randomized process that FTCHS uses to comply with the law in favor of a manipulated filtering of applicants based on race and disability. Venditti's scheme was successful in altering the pool of admitted students and deprived qualified students of a chance of admission to which they were required to be afforded under the law.

**F. FTCHS's History of Discriminatory Admission Practices**

134. FTCHS's 2023 admissions Lottery was not an isolated act of discrimination. Rather, Defendants discriminated against at least one additional student in January 2018.

135. On January 9, 2018, a student who shall remain nameless for confidentiality purposes learned that she had been accepted to FTCHS. Ecstatic to join this award-winning high school, this student toured the building on or about January 12, 2018. In addition to purchasing a school uniform, the student's family completed her enrollment papers during this visit. Set to start classes on January 19, the student also provided McGeehan with a copy of her Individualized Education Plan ("IEP") that was created because of an emotional disability.

136. Upon receiving this IEP, McGeehan indicated that there was no space in the special education classroom to fit the student's needs, and thus informed her she would no longer be able to enroll. This formal denial of the student was reiterated in a formal letter from Ms. McGeehan sent on January 16, 2018. The following day, the student's family member sent an email to Venditti describing the discrimination in detail, as well as subsequently placed several

phone calls to Ms. McGeehan. No member of FTCHS ever responded to the disabled student or her family.[8]

137. Indeed, Venditti's view that it was not his job to "fix" every student—meaning that FTCHS would not do what was legally required to provide services for or even admit students who required accommodation for their disabilities—transcends the illegal 2023 Lottery. This incident of blatant discrimination without even an attempt to conceal the practice further supports the precise attitude Venditti and FTCHS have toward disabled students, as well as the lengths he would go to and went to, ensuring his discrimination was successful.

## G. Plaintiff-Relator's Diligent Reporting to the President of the BOD

138. Profoundly disturbed about the information he had just learned regarding FTCHS's sham 2023 Lottery, Plaintiff-Relator did not hesitate to call and inform Garbarino, then-President of the BOD, of the conversations he had and personally witnessed, and immediately sent him Venditti's secret Lottery file and its commentary also contained within a follow-up email on February 8, 2023, following their phone conversation that same day.

139. From February 8, 2023 through February 17, 2023, Plaintiff-Relator had several telephone conversations with Garbarino and an in-person meeting to discuss Plaintiff-Relator's concerns. During one conversation on February 17, Garbarino mentioned a plan to retain the law firm Fox Rothschild LLP to conduct a thorough investigation into the incident, but indicated that BOD approval was necessary to begin the investigation.

---

[8]Further details of the student's discrimination at FTCHS are set forth in press articles about the incident. *See, e.g.*, Greg Windle, *Franklin Towne accused of discriminating against special needs student*, Chalkbeat Philadelphia (July 19, 2018), available at https://philadelphia.chalkbeat.org/2018/7/19/22186165/franklin-towne-accused-of-discriminating-against-special-needs-student.

140. On February 21, 2023, Venditti resigned as CEO, citing medical leave and his age as reasons via an email to the BOD. Venditti's resignation at the time of the initiation of a potential investigation into his illegal action is no mere coincidence.

141. A day later, Plaintiff-Relator had a phone call with Garbarino, inquiring about the status of the investigation. Garbarino confirmed that he intended to move forward with the investigation, but needed a quorum of the BOD to convene first and stated "good luck getting these clowns to come to a meeting where we would have a quorum." Garbarino also stated that he could not take any action, including restricting Venditti's computer/internal access, prior to a BOD vote for an investigation.

142. During Venditti's time on medical leave for the next several weeks, he continued to issue directives to staff.

143. Plaintiff-Relator continued to follow-up with Garbarino in the coming weeks regarding his analysis of evidence of FTCHS's sham Lottery, including through email communication.

144. Despite Plaintiff-Relator's diligent reminders and thorough explanations provided multiple times in email and over the phone, during which the President of the Board admitted (on several occasions) that he agreed that the Lottery's conduct constituted illegal practices and indicated that he would to present these concerns to the Charter Schools Office alongside Plaintiff-Relator, Garbarino and the members of the BOD failed to take any effective and timely action.

145. At Venditti's request, the BOD held an emergency meeting at 6:00 P.M. on February 27, 2023. After requesting to attend, Plaintiff-Relator was told by Garbarino that Garbarino preferred that he did not attend and that he would not be permitted to attend

regardless, as the meeting was an "Executive Board Meeting." Garbarino told Plaintiff-Relator this despite permitting other administrators not on the Executive Board to attend the meeting.

146. During this meeting, Venditti formally resigned from the BOD, with then-immediate effect.

147. The BOD also held a formal vote on the matter of whether to move forward with an investigation against Venditti. Despite several members voting in the affirmative, the BOD voted down the investigation, letting Venditti resign with no formal investigation of his egregious conduct constituting unlawful discrimination. Plaintiff-Relator was not permitted to vote.

148. Instead, the attendees voted to provide Venditti with over $300,000 in combined retirement bonus payments and accrued personal and vacation time.

149. At this emergency meeting, Plaintiff-Relator was not invited to attend, Venditti was given the opportunity to provide his commentary on the investigation, which he used to retaliate against Plaintiff-Relator.

150. Venditti not only revealed that he was aware of Relator-Plaintiff's identity as an administrator who sent good faith emails and had phone calls with the President of the BOD regarding Venditti's discriminatory and illegal actions, but used the opportunity to attack and malign Plaintiff-Relator's character. Namely, Venditti cited an over ten-year-old larceny charge against Plaintiff-Relator that was dismissed, and Plaintiff-Relator's record expunged, in an attempt to undermine the legitimacy of the charges and investigation, on the supposed grounds that Plaintiff-Relator was a "thief." Additionally, Venditti falsely asserted before the BOD that Plaintiff-Relator had pornography on his computer, a knowing false statement with no factual basis.

151. Upon learning of Venditti's verbal attacks and false statements, Plaintiff-Relator believed that internal reporting would result in retaliation. Plaintiff-Relator's concerns have materialized, as the BOD has engaged in cover-up tactics and Plaintiff-Relator has been subject to a hostile work environment, which has materially and adversely affected his conditions of employment.

152. In addition to the BOD not voting in favor of an investigation into Venditti's actions, the BOD voted to affirm a resolution put forth by Venditti to appoint the Dean of Students as his successor as CEO of FTCHS to prevent Plaintiff-Relator from accessing additional evidence of the fraudulent schemes described herein, and to punish Plaintiff-Relator by denying him the opportunity of advancement.

153. Venditti self-servingly maligned the investigation into his illegal conduct through *ad hominem* attacks that had no grounding in the potential investigation. Venditti's reaction to the investigation was sufficient to suppress a potential investigation from his fellow BOD members, who were subordinates to Venditti.

154. During this same phone call, Garbarino informed Plaintiff-Relator that he should leave his position and simply get out of the "mad house" as a next course of action. Plaintiff-Relator has failed to take the easy way out as Garbarino suggested, and maintained his position at FTCHS despite fear of retaliation in order to see that justice prevails in this matter.

155. Garbarino proceeded to resign from the BOD after serving as a member, including as President, of the BOD for over 20 years.

156. In fact, all members of the BOD who voted to investigate Venditti's manipulation of the Lottery resigned from the BOD in the ensuing weeks due to the BOD's failure to investigate Venditti.

157. Plaintiff-Relator's actions were sufficient to put Defendants on notice that he might pursue litigation to report what he reasonably believed to be fraudulent misconduct, including under the False Claims Act.

158. Rather than properly investigate and remedy the fraudulent misconduct reported by Plaintiff-Relator, Defendants decided to cover up Defendant Venditti's misconduct.

159. In doing so, and as a direct result of Plaintiff-Relator's activities as detailed herein throughout this Complaint, Defendants retaliated against Plaintiff-Relator by curtailing his job responsibilities, permitting his professional reputation to be damaged, and limiting his future potential professional advancement and related income increases.

160. Plaintiff-Relator has experienced marginalization and other hostility from co-workers since reporting the unlawful conduct described herein.

## VII. CONCLUSION

161. As detailed herein, since 2014, Defendants have made false claims for purposes of obtaining federal funds by falsely certifying compliance with all federal, state, and local laws, in an effort to defraud the United States of taxpayer dollars, under the guise of providing quality education to all children.

162. As a result of, Defendants conduct, millions of dollars of the scarce educational resources provided by the Government have been improperly awarded to, and significant amounts misappropriated by, Defendants.

## COUNT I: FALSE CLAIMS ACT
## 31 U.S.C. §§ 3729(a)(1)(A)
**(Asserted Against All Defendants)**

163. Plaintiff-Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

164. This claim is a claim by Plaintiff-Relator, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendants, for knowingly causing false claims to be presented to the U.S. DOE.

165. Defendants submitted claims for funding through educational grants and otherwise, knowing that such false claims would be submitted to the U.S. DOE and PA DOE for reimbursement, and knowing that such Departments of Education were unaware that they were conducting no-bid construction projects in connection with and induced by kickbacks in the form of illegal remuneration through free vacation services and personal construction services despite their certification of compliance with applicable federal, state, and local laws and regulations prohibiting such conduct.

166. By virtue of the acts alleged herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for funding to the United States Government, in violation of the FCA, 31 U.S.C. § 3729, *et seq.*

**COUNT II: FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)(A)**
**(Asserted Against FTCHS, the BOD, and Venditti)**

167. Plaintiff-Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

168. This claim is a claim by Plaintiff-Relator, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendants, for knowingly causing false claims to be presented to the U.S. DOE.

169. Defendants submitted claims for funding through educational grants and otherwise, knowing that such false claims would be submitted to the U.S. DOE and PA DOE for reimbursement, and knowing that such Departments of Education were unaware that FTCHS, the BOD, and Venditti discriminated against student applicants on the basis of race and disability

despite their certification of compliance with applicable federal, state, and local laws and regulations prohibiting such conduct.

170. By virtue of the acts alleged herein, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for funding to the United States Government, in violation of the FCA, 31 U.S.C. § 3729, *et seq.*

**COUNT III: FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)(B)**
**(Asserted Against All Defendants)**

171. Plaintiff-Relator repeats and re-alleges each and every allegation contained in the paragraphs above and though fully set forth herein.

172. This claim is a claim by Plaintiff-Relator, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against Defendants, for knowingly causing to be presented false claims to the U.S. DOE. Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States through concealment of Defendants' illegal schemes identified in Count I.

173. By virtue of the acts alleged herein, Defendants knowingly used, or caused to be used, false records or statements, and the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT IV: FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)(B)**
**(Asserted Against FTCHS, the BOD, and Venditti)**

174. Plaintiff-Relator repeats and re-alleges each and every allegation contained in the paragraphs above and though fully set forth herein.

175. This claim is a claim by Plaintiff-Relator, on behalf of the United States, for treble damages and penalties under the FCA, 31 U.S.C. §§ 3729-3733, against FTCHS, the BOD, and

Venditti, for knowingly causing to be presented false claims to the U.S. DOE. FTCHS, the BOD, and Venditti knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States through concealment of their illegal schemes identified in Count II.

176. By virtue of the acts alleged herein, FTCHS, the BOD, and Venditti knowingly used, or caused to be used, false records or statements, and the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT V: FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)(C)**
**(Asserted Against All Defendants)**

177. Plaintiff-Relator repeats and re-alleges each and every allegation contained in the paragraphs above as though fully set forth herein.

178. Defendants knowingly concealed or knowingly and improperly presented or caused to be presented false claims to the United States in violation of 31 U.SC. § 3729(a)(1)(A), knowingly made or caused to be made a false record or statement material to a false claim in violation of 31 U.SC. § 3729(a)(1)(B), and/or avoided or decreased an obligation to pay or transmit money to the United States in violation of 31 U.S.C. §3729(a)(1)(G), and conspired to commit such acts or omissions in violation of 31 U.S.C. §3729(a)(1)(C).

**COUNT VI: FALSE CLAIMS ACT**
**31 U.S.C. § 3730(h)**
**(Asserted Against FTCHS, the BOD, and Venditti)**

179. Plaintiff-Relator restates and incorporates each and every allegation above as if the same were fully set forth herein.

180. While employed at FTCHS, Plaintiff-Relator engaged in conduct protected under 31 U.S.C. § 3730(h) by reporting and taking action to stop Defendants' violations of the FCA.

181. FTCHS, the BOD, and Venditti knew or suspected that Plaintiff-Relator was engaged in conduct protected under 31 U.S.C. § 3730(h).

182. FTCHS, the BOD, and Venditti materially altered the terms and conditions of Plaintiff-Relator's employment for the worse because of his protected conduct in reporting the violations described herein and undertaking efforts to correct Defendants' unlawful activity in violation of the FCA.

183. Plaintiff-Relator has suffered significant economic and non-economic damages as a result of the acts of FTCHS, the BOD, and Venditti. The amount of these damages is to be determined by a jury.

## VIII. JURY DEMAND

Plaintiff-Relator, on behalf of himself and the United States, hereby demands trial by jury on all issues so triable.

Dated: March 29, 2023

/s/ *Eric L. Young*
Eric L. Young
YOUNG LAW GROUP P.C.
3031 C Walton Rd., Suite 301
Plymouth Meeting, PA 19462
Telephone: (215) 367-5151
Facsimile: (215) 367-5143
Email: eyoung@young-lawgroup.com

James C. Shah
Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103 133
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
ajberin@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
lrubinow@millershah.com

*Attorneys for Plaintiff-Relator*